IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JERSEY DATACOMM & CABLE, INC., <br><br>                Plaintiff, <br>        vs. <br><br> WALKER AND ASSOCIATES, INC., <br><br>                Defendant. | Civil No. 1:14-cv-4459 (RBK/KMW) <br><br><br> Motion Day: June 6, 2016 |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY PURSUANT TO FED. R. EVID. 702

**BROWN & CONNERY, LLP**
William M. Tambussi, Esquire
Eric D. Milavsky, Esquire
360 Haddon Avenue
Westmont, New Jersey 08108
T: (856) 854-8900
F: (856) 858-4967
wtambussi@brownconnery.com
emilavsky@brownconnery.com

**WALL BABCOCK, LLP**
J. Dennis Bailey, Esquire (*admitted pro hac vice*)
1076 West 4th Street
Winston-Salem, North Carolina 27101
T: (336) 722-6300
F: (336) 722-1993
dbailey@wallbabcock.com

*Attorneys for Defendant*

2657019.v1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.........................................................................1

FACTUAL BACKGROUND ..........................................................................3

   I.     Allegations of the Complaint.............................................................3

   II.    Information Revealed During Discovery ...........................................4

       A. Testimony of JDC's Corporate Designee......................................4

       B. Testimony of JDC's Primary Contact at SunGard ...........................5

       C. Walker's Sales to SunGard................................................................5

   III.   Plaintiff's Expert Report.....................................................................6

LEGAL STANDARD .....................................................................................9

ARGUMENT ................................................................................................12

   I.     The Opinion Regarding JDC's Projected Revenues .........................12

       A. Mr. Young's Methodology ..............................................................12

       B. Legal Argument...............................................................................14

   II.    The Opinion Regarding JDC's Profit Margin Growth Rate .............18

       A. Mr. Young's Methodology ..............................................................18

       B. Legal Argument...............................................................................20

   III.   The Opinion Regarding the Differential Between Projected and Actual
       Profits................................................................................................22

       A. Mr. Young's Methodology ..............................................................22

       B. Legal Argument...............................................................................22

IV.     The Opinion Regarding Lost Salary to Jack Palmer ........................ 23

     A. Mr. Young's Methodology ................................................................. 23

     B. Legal Argument ................................................................................ 24

V.      The Opinion Regarding Future Losses to JDC and Mr. Palmer ....... 25

     A. Mr. Young's Methodology ................................................................. 25

     B. Legal Argument ................................................................................ 26

CONCLUSION .................................................................................................. 29

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

<u>Castro v. Sanofi Pasteur, Inc.</u>,

   2015 WL 5770381 (D.N.J. Sept. 30, 2015) ........................................................ 11

<u>Daubert v. Merrell Dow Pharms., Inc.</u>,

   509 U.S. 579 (1993) ............................................................................... *passim*

<u>Elcock v. Kmart Corp.</u>,

   233 F.3d 734 (3d Cir. 2000) ....................................................................... 11

<u>General Elec. Co. v. Joiner</u>,

   522 U.S. 136 (1997) ............................................................................. 10, 18

<u>In re Paoli R.R. Yard PCB Litig.</u>,

   35 F.3d 717 (3d Cir. 1994) .......................................................................... 9

<u>Kannankeril v. Terminix Int'l, Inc.</u>,

   128 F.3d 802 (3d Cir. 1997) ........................................................................ 9

<u>Kumho Tire Co. v. Carmichael</u>,

   526 U.S. 137 (1999) ................................................................................ 10

<u>Lithuanian Commerce Corp. v. Sara Lee Hosiery</u>,

   179 F.R.D. 450 (D.N.J. 1998) ................................................................... 11

<u>Magistrini v. One Hour Martinizing Dry Cleaning</u>,

   180 F. Supp. 2d 584 (D.N.J. 2002) ............................................................ 10

<u>Pleasant Valley Promenade v. Lechmere, Inc.</u>,

   464 S.E.2d 47 (N.C. Ct. App. 1995) ........................................................... 25

<u>PNC Bancorp, Inc. v. C.I.R.</u>,

   212 F.3d 822 (3d Cir. 2000) ...................................................................... 28

<u>Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio</u>,

40 F.3d 1454 (3d Cir. 1994) ................................................................. 24

RSB Lab. Servs., Inc. v. BSI, Corp.,

847 A.2d 599 (N.J. App. Div. 1004) ................................................... 25

Sommer v. Kridel,

378 A.2d 767 (N.J. 1977) .................................................................... 22

Thermal Design, Inc. v. M & M Builders, Inc.,

698 S.E.2d 516 (N.C. Ct. App. 2010)................................................. 22

Warren Distrib. Co. v. InBev USA L.L.C.,

2010 WL 2179167 (D.N.J. May 28, 2010)......................................... 11

Yarchak v. Trek Bicycle Corp.,

208 F. Supp. 2d 470 (D.N.J. 2002)........................................................ 9

ZF Meritor LLC v. Eaton Corp.,

696 F.3d 254 (3d Cir. 2012) ............................................................... 11

## **Constitutional Provisions**

U.S. Const. art. III, § 2 ............................................................................. 27

## **Rules of Civil Procedure**

Fed. R. Civ. P. 37(c)................................................................................. 10

Fed. R. Civ. P. 54(c)................................................................................. 27

Fed. R. Evid. 702......................................................................... 2, 9, 10, 29

## PRELIMINARY STATEMENT

This motion seeks exclusion of expert testimony concerning economic damages allegedly sustained by plaintiff Jersey Datacomm & Cable, Inc. ("JDC"). JDC is a re-seller of networking equipment and cabling. It buys from distributors and sells to end users at a mark-up. Its largest end-user customer was a multinational information-technology company named SunGard Availability Services ("SunGard"). As of late 2011, SunGard had become dissatisfied with JDC's prices and delivery times on certain product lines and therefore contacted other suppliers. One such supplier was defendant Walker and Associates, Inc. ("Walker"), a company that also sold goods to JDC. In this lawsuit, JDC claims that Walker acted improperly when acquiescing to SunGard's request to sell "direct."

The expert JDC retained to quantify its alleged damages is a valuator named Christopher Young. Based on a few loose extrapolations from data never produced in discovery, Mr. Young opined that, were it not for Walker's conduct, JDC would have experienced extraordinary revenue increases from its SunGard account from 2012 onward. Additionally, he opined that JDC's principal, Jack Palmer, would have earned hundreds of thousands of dollars more in salary—even though Mr. Palmer individually is not a party in this matter. Ultimately, while Walker's net profit from its direct business with SunGard was less than $100,000 (even under

1

Mr. Young's model), Mr. Young concludes that Walker is responsible for more than $1.8 million in combined damages to JDC and Mr. Palmer in this matter.

Mr. Young's opinion does not meet the standard for admissibility under Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993). The opinion is not reliable nor, to the extent that it purports to opine on damages sustained by a nonparty, is it relevant. It is instead a series of manipulations of arbitrary data, none of which are connected to the facts or driven by any analysis of SunGard's demand for JDC's products. As discussed herein, each distinct portion of the five-step method Mr. Young used to calculate damages is profoundly flawed, and his opinion should be excluded entirely.

## FACTUAL BACKGROUND

### I.    Allegations of the Complaint

JDC is a reseller of computer cables and equipment. *Complaint (Exhibit A),* ¶ *1.* In or around 2001, JDC developed a line of business with SunGard. *Id. at ¶¶ 3-6.* This included a blend of computer network equipment and cables. *Id. at ¶ 6.* In or around 2010, JDC changed suppliers, turning to Walker for the goods required to service SunGard. *Id. at ¶ 7.*

JDC alleges that it had an agreement with Walker that included: "a promise to honor price discounts and pricing as required by Sungard [sic]"; "a promise to 'blind ship' all equipment to Sungard [sic] and otherwise act as JDC's discrete [sic] representative and agent rather than as Plaintiff's actual or perceived competitor; and "a promise to refrain from competing with Plaintiff." *Id. at ¶ 9.*

JDC further alleges that Walker breached these obligations. *Id. at ¶ 13.* According to JDC, Walker did not comply with shipping obligations, and "using confidential, proprietary and privileged information that it gained as the trusted agent and representative of [JDC], [Walker] unfairly and unreasonably seized, converted and exploited the business advantages developed by [JDC]." *Id. at ¶ 15.*

## II.   Information Revealed During Discovery

### A.   Testimony of JDC's Corporate Designee

JDC's president and 100% owner is Jack Palmer. *Palmer Dep. Transcript (Exhibit B), 29:2-11*. Mr. Palmer testified as follows in his capacity as JDC's corporate designee:

- JDC did not have any agreement with SunGard that required SunGard to purchase products from JDC. *Id. at 89:18-92:2.*

- There was no guarantee that JDC would continue to receive SunGard's business beyond 2011; rather, JDC always had to compete for that business with all other suppliers in the market. *Id. at 317:13-318:9.*

- Walker did not use propriety or confidential information obtained from JDC to initiate its own line of business directly with SunGard in 2012; rather, SunGard reached out to Walker and requested that Walker provide quotes. *Id. at 156:2-158:22.*

- When SunGard approached Walker for quotes for direct sales, the pricing offered by Walker was better than the pricing offered by JDC on the same products. *Id. at 154:9-155:3.*

- While JDC's sales to SunGard have lessened since 2012, JDC continues to operate as a going concern. It still sells to SunGard and other customers, including Turner Broadcast Systems, the Philadelphia Eagles, and Ancero. *Id. at 331:4-20.*

- As to whether JDC ever had the opportunity to "grow" the amount of its business with SunGard, Mr. Palmer testified as follows:

  > Q.   Was there ever opportunity to grow the business at SunGard if you had other reps or salesmen at your company?
  >
  > A.   I don't believe so. I don't know. I don't know. I was more dedicated to the products at hand or the

projects at hand. So I don't know if I can answer that question.

*Id.* at 83:8-20.

**B.     Testimony of JDC's Primary Contact At SunGard**

JDC's "main contact" at SunGard was an individual named David Kramer.

*Id.* at 152:2-6. Mr. Kramer testified as follows at his deposition:

- As of 2011, SunGard had become dissatisfied with JDC's pricing and delivery times. *Kramer Dep. Transcript (Exhibit C), 43:17-22.* "Multiple departments" at SunGard expressed complaints with JDC, and these issues were starting to impact SunGard's ability to perform its work. *Id.* at 43:10-25.

- For these reasons, SunGard looked elsewhere for suppliers. *Id.* at 18:18-19:25; 21:21-23; 43:17-22; 45:23-25.

- Mr. Kramer obtained the names of other potential suppliers from SunGard's procurement department. *Id.* at 15:19-22; 19:1-14. Walker was one such name. *Id.* at 19:13-14.

- SunGard initiated contact with Walker in November 2011 and requested quotes from Walker. *Id.* at 42:17-25; 63:5-8.

- On some of the quotes Walker offered better pricing and lead times, so SunGard began purchasing directly from Walker. *Id.* at 24:22-25:6; 54:13-18.

**C.     Walker's Sales To SunGard**

With regard to the volume of business Walker did with SunGard after SunGard asked it to go "direct," Walker produced in discovery detailed charts showing every sale it made to SunGard from 2012 to the present. See *Walker Sales*

*Data (Exhibit D)*. As reflected in this data, Walker's gross revenues from sales to SunGard by year were as follows:

| | |
|---|---|
| 2012 | $393,936 |
| 2013 | $357,290 |
| 2014 | $173,393 |
| Total: | $924,619 |

<u>*Id.*</u>

Walker has not sold any goods to SunGard since 2014.

## III.   Plaintiff's Expert Report

Plaintiff's valuation expert, Christopher Young, issued his report on November 30, 2015. <u>See</u> *Young Report (Exhibit E)*. In his report, Mr. Young did not consider any of the testimony above or the sales information produced by Walker. He instead relied upon the allegations of JDC's complaint and, for his financial projections, upon documentation and information provided to him by JDC's accountant, Vladimir Shapiro. <u>See</u> *id. at 10-15*. Mr. Shapiro provided Mr. Young with 100 pages of SunGard Profit & Loss statements, as well as a chart summarizing gross SunGard revenues and costs by year. <u>See</u> *Shapiro Documents (Exhibit F)*. JDC did not produce any of these documents during the fact-discovery

period, nor did it identify Mr. Shapiro either in its Rule 26 disclosures or interrogatory responses. [1]

In the report, Mr. Young set forth his damage projections in five distinct steps:

**(I)** He projected what JDC's gross annual revenues would have been each year from 2012 (the first year of the damages period) through 2015 had it not been for Walker's alleged improper conduct;

**(II)** He projected what JDC's profit margins would have been on these annual gross revenues had it not been for Walker's alleged unlawful conduct;

**(III)** He took the difference between JDC's projected profits from 2012 to 2015 per the first two steps and its actual profits during the same time period to determine the amount of JDC's net losses through the end of 2015 (**total: $250,100**);

**(IV)** He projected additional amounts that JDC's president, Jack Palmer, would have earned in salary each year from 2012 to 2015 had it not been for Walker's alleged unlawful conduct (**total: $260,412**); and

**(V)** He projected "future" damages incurred by JDC and Mr. Palmer (*i.e.*, damages from January 1, 2016 onward) (**total: $1,360,499**).

See *id.* at 11-15.

---

[1] Walker has filed contemporaneously herewith a motion to exclude any use of the Shapiro documents or information pursuant to Fed. R. Civ. P. 37(c).

Thus, in total, Mr. Young opined that Walker is responsible for **$1,871,011** in damages in this matter.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that an expert witness may give opinion testimony if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

Under this Rule, the Court acts as a "gatekeeper" to ensure that the expert's opinion is relevant to the case and is the product of a reliable application of scientific methods. Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579, 600 (1993). See also Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 495 (D.N.J. 2002) ("The linchpin of the Daubert . . . analysis is an evaluation of the 'relevance and reliability' of the proposed expert testimony.") Once challenged, it is the burden of the party offering the expert testimony to demonstrate that the opinion meets this threshold. Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 807 (3d Cir. 1997). The offeror need not prove that the expert's opinion is "perfect," but it must establish that the opinion rests on "good grounds." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743-44 (3d Cir. 1994). Further, "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible." Id. at 745. Ultimately, expert testimony should be excluded where there "is simply too great

an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 145-46 (1997).

The factors considered in determining whether an expert opinion meets this threshold are flexible and case-specific. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 142 (1999). They may include: whether the opinion offers a testable hypothesis; whether its methodologies have been subject to peer review and publication; the known or potential error rates; and whether the methodologies are generally accepted in the expert's field. Id. at 137 (citing Daubert, 509 U.S. at 589). Other factors include: whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation; whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; whether the expert has adequately accounted for alternative explanations; whether the expert is being as careful as he would be in his professional work outside of the litigation context; and whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert. See Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 594-95 (D.N.J. 2002) (applying foregoing factors); see also Fed. R. Evid. 702 Advisory Committee Notes (noting federal courts consider each of the foregoing factors).

For economic experts in particular, mathematical precision is not required, but there must be a "sufficient factual foundation," and the expert's assumptions cannot be "blatantly incorrect." Warren Distrib. Co. v. InBev USA L.L.C., Cv. No. 07-1053, 2010 WL 2179167, at *4 (D.N.J. May 28, 2010) (RBK/JS). Accordingly, proffered expert opinions on damages that are not reasonably tied to the economic realities of the situation are appropriately excluded. See, e.g., Elcock v. Kmart Corp., 233 F.3d 734, 754-56 (3d Cir. 2000) (holding district court erred in admitting economist's opinion on lost earnings where economist disregarded plaintiff's previous working conditions, current earning capacity, and potential lifespan); ZF Meritor LLC v. Eaton Corp., 696 F.3d 254, 291-92 (3d Cir. 2012) (affirming exclusion of expert opinion creating hypothetical but-for earnings scenario without adequate explanation or factual basis for projections); Lithuanian Commerce Corp. v. Sara Lee Hosiery, 179 F.R.D. 450, 460 (D.N.J. 1998) (excluding opinion on damages where expert's conclusions were not derived by reasonable interpretation of facts or supported by legitimate explanation); Castro v. Sanofi Pasteur, Inc., Cv. No. 11-7178, 2015 WL 5770381, at *7 (D.N.J. Sept. 30, 2015) (inclusion of all potentially-relevant variables is not prerequisite to admissibility; however, "where there is a meaningful indication that the excluded variables would have impacted the results, an excluded variable may render an opinion unreliable.").

## ARGUMENT

As set forth below, none of the five components of Mr. Young's opinion meet the standard for admissibility.

## I.     The Opinion Regarding JDC's Projected Revenues

## A.     Mr. Young's Methodology

Mr. Young first attempted to project what JDC's annual gross revenue from SunGard would have been from 2012 to 2015 if not for Walker's alleged conduct. *Id. at 10-11*. To do this, he extrapolated a "revenue growth rate" from a two-year window—2009 to 2011—within the Shapiro data. See *id. at 11*. The shaded area of the table below shows the specific data upon which Mr. Young relied, compared against the information in JDC's tax returns and interrogatory responses:

| Year | SunGard Revenue (Per Shapiro Data) | All Revenue (Per JDC's Tax Returns) | SunGard Revenue (Per JDC's Irog. Responses) |
|------|------|------|------|
| 2002 | - | $1,011,057 | $1,178,249 |
| 2003 | - | $1,032,264 | $1,061,893 |
| 2004 | - | $1,139,707 | $851,395 |
| 2005 | - | $1,267,653 | $536,571 |
| 2006 | - | $648,099 | $388,930 |
| 2007 | - | $544,099 | $415,335 |
| 2008 | $848,724 | $911,591 | $893,391 |
| 2009 | $1,086,033 | $1,214,466 | $1,107,277 |
| 2010 | $1,006,976 | $1,050,156 | $958,521 |
| 2011 | $1,724,345 | $1,752,062 | $2,254,258 |

See *id. at 11 (Table 1); JDC Tax Returns (Exhibit G); JDC Interrogatory Responses (Exhibit H), Response No. 8 .*

Using only these shaded data points, Mr. Young derived a 26% annual revenue growth rate. *Young Report, p. 11*. He explained his methodology for deriving this aggressive growth rate in one sentence: "The two year compounded revenue growth rate of SunGard from 2009 to 2011 was 26% [($1,724,345/1,086,033)^1/2 − 1]." *Id.* According to Mr. Young's calculations, at this rate, JDC's growth would have outpaced growth in the rest of the industry by a factor of six. See *id. at 24* (noting outlook for "IT Services and Communications Resellers" industry is steady 4% growth).

Mr. Young then applied the 26% annual growth rate to a "base-year" average (which he derived by averaging gross SunGard revenue in 2010 and 2011) to project the following revenue figures from 2012 to 2015:

| Year | Gross Revenue |
|------|---------------|
| 2012 | $1,720,811 |
| 2013 | $2,168,321 |
| 2014 | $2,732,210 |
| 2015 | $3,442,742 |
| Total: | $10,064,084 |

*Id. (Table 2)*.

These projected earnings exceeded JDC's actual earnings from the same time period by nearly $7 million. Compare *id. (Table 2)* (projecting $10,064,084 in total gross revenue from 2012 to 2015); *id. (Table 1)* (noting actual gross revenue of $3,074,641 from 2012 to 2015). In addition, by 2015, the level of projected

revenue would have more than tripled its prior average throughout the company's history.

### B.     Legal Argument

Mr. Young's SunGard revenue projections do not meet the reliability threshold. Every material factor under the <u>Daubert</u> progeny weighs decisively in favor of exclusion. Specifically, the projections do not offer a testable hypothesis; they do not utilize methodologies that are widely-accepted or supported by any type of research, publication or peer review; they omit key—indeed, **<u>dispositive</u>**— variables; they contain unfounded assumptions; they do not account for alternative explanations; and they reach conclusions that are not tethered to the record by even the thinnest analytical threads. These factors are discussed below.

First, Mr. Young's projections do not have a sufficient factual foundation. Mr. Young did not consider the concessions in Mr. Palmer's testimony. He did not review Mr. Kramer's testimony at all. He did not consider Walker's sales data. He did not even consider the majority of data in JDC's own tax returns and interrogatory responses. Instead, he founded his opinion on the Shapiro data that materialized at the eleventh hour, without having been vetted through discovery. This data differed significantly from JDC's interrogatory responses and was even contrary to JDC's tax returns. It was also far more limited in the time period it covered, and thus gave a less complete picture of JDC's revenue history. As set

forth in the contemporaneously-filed motion to exclude, that data has no place at trial in this action. Accordingly, Mr. Young's reliance on the Shapiro information, to the exclusion of other key information of record, undermined the reliability of his projections.

Second, the projections do not offer any testable hypothesis and are not supported by any published, generally-accepted, or even logical methodology; rather, they are based on a crude extrapolation of meaningless data. While the two-year measurement period Mr. Young selected (2009 to 2011) conveniently fit his objective of trumping up growth, he did not explain why he focused on that limited time period—particularly for a company that experienced considerable revenue fluctuations over the course of its fifteen-year history but had modest, if any, discernible long-term growth. He also did not explain how, or cite any authority for the proposition that, applying a compound growth rate (a metric conventionally used to track stock or fund performance)[2] to this data was a reliable means of forecasting revenue. Simply put, Mr. Young's simplistic extrapolation from a smattering of cherry-picked data did not paint an accurate picture of JDC's actual growth trends.

---

[2] See, e.g., Pocket Risk Client Guide, Understanding Average Annual Return and Compounded Annual Growth Rate (CAGR) (available at http://blog.pocketrisk.com/client-guide-explaining-difference-average-annual-return-compounded-annual-growth-rate-cagr/ ) (last visited May 6, 2016).

Third, and even more fundamentally, the projections do not address the key—in fact, the only—variable driving JDC's revenue levels from 2012 to 2015: SunGard's demand for JDC's products. The only way JDC's revenue from its SunGard account could increase by 26% each year would be if SunGard bought significantly more product from JDC and/or bought at a higher price. But Mr. Young did not even attempt to identify which products SunGard would have purchased at higher volumes or prices, or why. He also did not attempt to reconcile his projections with the fact that Mr. Palmer testified that he did not think JDC could grow the SunGard business, *Palmer Dep., 83:8*-20, or, as importantly, with the fact that SunGard was as of late 2011 dissatisfied with JDC and had begun to buy from competitors, *Kramer Dep., 18:18-19:25; 21:21-23; 43:17-22; 45:23-25.* Mr. Young thus failed to address the sole factor determining what JDC's sales to SunGard would have been; had he done so, he could not possibly have justified the conclusions he drew.

Fourth, on a related point, the implicit assumption of booming SunGard demand in Mr. Young's projections from 2012 to 2015 is completely unfounded. There is no support for the notion that SunGard's demand for JDC's products would have essentially tripled by 2015. More than that, this assumption is demonstrably erroneous in view of Mr. Palmer's own testimony regarding JDC's growth capacity, Mr. Kramer's testimony regarding SunGard's movement toward

other suppliers, and Walker's sales data indicating sluggish revenue on the product lines it sold direct to SunGard. Thus, not only does the assumption of exploding SunGard demand from 2012 to 2015 find no support in the record, but the record directly contradicts it.

Fifth, even if the aggressive growth projections were otherwise sound, there still remains a logical disconnect between JDC's failure to meet those projections and anything that Walker did in this case. As of 2011, Walker was one of many suppliers that JDC used to service SunGard. See *JDC's Interrogatory Responses (Exhibit H), Response No. 10*. When Walker went direct with SunGard the following year at SunGard's request, it is not as though Walker took all of JDC's business with it. Rather, as noted, the portion of business that Walker took direct to SunGard never exceeded $400,000 in any one year, and it eventually diminished to nothing by 2015. *Walker Sales Data (Exhibit D)*. All in, it was less than $1 million in gross sales. *Id.* It is a *non sequitur* to say, as Mr. Young does, that because Walker took less than $1 million of JDC's sales to SunGard over a three year period, JDC lost approximately $7 million of revenue from its SunGard account during the same period. see *Young Report, p. 11 (Table 1 and Table 2)*. Indeed, there is nothing connecting Walker's direct business with SunGard, even if somehow unlawful, to JDC's inability to achieve the lofty growth projections offered by Mr. Young. Rather, as the record manifestly demonstrates, JDC did not

reach those unrealistic projections because SunGard's demand for its products simply was not there.

In sum, Mr. Young's revenue projections are the result of reductive number play, not a reliable application of a valid methodology to legitimate, or even usable, data. There is "too great an analytical gap" between the 2009-2011 Shapiro data and the conclusion that JDC would have experienced 26% annual revenue growth from the SunGard account from 2012 to 2015. <u>Joiner</u>, 522 U.S. at 145-46. Further, there is an equally wide analytical gap between the alleged unlawful conduct by Walker and JDC's inability to meet these aggressive projections. This portion of Mr. Young's opinion does not meet the minimum reliability threshold and must be excluded.

## II.    The Opinion Regarding JDC's Profit Margin Growth Rate

### A.    Mr. Young's Methodology

After projecting the above yearly gross revenues, Mr. Young's next step was to project JDC's expected profit margins on those revenues. To do this, he first identified JDC's historical profit margins. Appendix 5 of his report sets forth these profit margins by year. Mr. Young derived these profit margins by making "adjustments" to JDC's annual revenue/cost ratio—specifically, he added back onto the revenue side certain business expenses that JDC claimed on its tax returns—and then subtracting total yearly costs from total yearly revenue per the

Shapiro data. *Id. at 11-12*; *Appendix 5*. With these "adjustments," Mr. Young set forth JDC's historical profits and profit margins by year as follows:

| Year | "Adjusted" Net Profit | "Adjusted" Profit Margin |
|------|------|------|
| 2008 | $45,112 | 4.95% |
| 2009 | $29,862 | 2.46% |
| 2010 | $58,065 | 5.53% |
| 2011 | $50,865 | 2.90% |

*Id., Appendix 5.*

Mr. Young then stated that because these "adjusted" profit margins per the Shapiro data were 2.46% in 2009 and 2.90% in 2011, this reflects a compounded annual increase of 8.7%, which can in turn be applied to project margin growth for each year after that from 2012 to 2015. *Id. at 11-12*. Accordingly, Mr. Young applied this 8.7% annual growth rate to a "base year" average profit margin of 4.2% (which he derived by averaging the company's margin in 2010 with its margin in 2011) to reach the following projections for net profit from 2012 to 2015.

| Year | Projected Gross Revenue | Adjusted Profit Margin | Projected Net Profits |
|------|------|------|------|
| 2012 | $1,720,811 | 4.2% | $72,552 |
| 2013 | $2,168,321 | 4.6% | $99,337 |
| 2014 | $2,732,210 | 5.0% | $136,009 |
| 2015 | $3,442,742 | 5.4% | $186,220 |
| Total Net Profits (2012 – 2015): | | | $494,118 |

*Id. at 12 (Table 3)*

**B.**     **Legal Argument**

Mr. Young's profit-margin projections do not meet the reliability threshold. This portion of Mr. Young's analysis does not rest upon an adequate factual foundation; does not offer a testable hypothesis; is not based on methodologies that are widely-accepted or supported by any type of publication or peer review; does not address key variables; and contains unsupported assumptions. Like the prior step of Mr. Young's analysis, it is wholly unreliable.

Initially, the profit-margin projections spring from the same improper factual foundation as the gross-revenue projections: the documents and information provided by Mr. Shapiro. For example, Mr. Young purportedly relied on information from and discussions with Mr. Shapiro in making the above "adjustments"—that is, manipulations through which thousands of dollars of costs which JDC held out to the Internal Revenue Service as legitimate business expenses were added back to the revenue side. *Id. at 11-12*. Whatever Mr. Shapiro may have said to Mr. Young, this is a decidedly tenuous position for an expert to occupy. And more broadly, *all* of the profit figures in Mr. Young's report were based on the data and information provided by Shapiro—which JDC never

produced in discovery, and which materially conflicted with JDC's tax returns.[3] The profit-margin projections thus do not have a reliable factual foundation.

Moreover, as with the revenue projections, the methodology itself is as unreliable as the factual foundation. Mr. Young plucked data from an isolated two-year period—2009 to 2011—without explaining why he chose this period to the exclusion of a decade of additional data, and without citation to a single publication or generally-accepted principle. Additionally, he again failed to analyze any business-specific reasons why JDC's margins would have increased from 2012 to 2015. It is a basic economic concept that to experience an 8.7% annual increase in profit margins, either or both of two things must happen: the company's costs must fall or it must charge higher prices. But Mr. Young did not explain how either could have occurred during a time period when SunGard was already dissatisfied with JDC's pricing and when, as discussed below, he was projecting steadily increasing officer compensation. The notion of a linear profit-margin increase from 2012 to 2015 is an unfounded assumption. Mr. Young's profit-margin projections during this time period are, like the revenue-growth projections, a manipulation of numbers unsupported by any valid analysis or by the facts. It is not reliable and must be excluded.

---

[3] Mr. Young's report states "we relied upon . . . JDC's accountant to reconcile and answer any questions or discrepancies between the tax returns and internal financial statements. See Appendix 5 for more details." *Young Report, p. 10*. Appendix 5 then sets forth yearly profit figures above.

III. **The Opinion Regarding the Differential Between Projected and Actual Profits**

A. **Mr. Young's Methodology**

Mr. Young's third step was to take the difference between the total of the net-profit projections for 2012 to 2015 ($494,118) and the total of JDC's actual profits during the same timeframe. However, in performing this task, Mr. Young only deducted actual profits from 2012 through 2014 ($244,018), and did not make any effort to estimate or deduct actual profits from 2015. Mr. Young thus arrived at a total past lost profit estimate of $250,100. *Id.* *at 12-13.*

B. **Legal Argument**

Mr. Young did not reliably calculate net lost profits. Initially, because the projected profit figures arose from the first two steps of the analysis discussed above, all of the same reliability defects under Sections I and II apply. Further, beyond those defects, Mr. Young did not properly calculate the net difference between projected and actual profits because he neglected to deduct actual profits JDC earned from SunGard in 2015, thus artificially increasing the differential. Similarly, he provided no analysis of the impact of JDC's mitigation efforts[4],

---

[4] JDC was required to mitigate its losses. See Thermal Design, Inc. v. M & M Builders, Inc., 698 S.E.2d 516, 523-24 (N.C. Ct. App. 2010) (party harmed by tort or breach of contract is required to use due care to minimize the loss); accord Sommer v. Kridel, 378 A.2d 767, 771 n. 3 (N.J. 1977) ("It is well settled that a party claiming damages for a breach of contract has a duty to mitigate [its] loss.").

including additional earnings from new or other customers besides SunGard. Thus, this step of calculation, like the others, is not valid or reliable.

## IV.     The Opinion Regarding Lost Salary to Jack Palmer

### A.      Mr. Young's Methodology

As a fourth step, Mr. Young endeavored to put Mr. Palmer "in the same position, had it not been for the allegations." *Id. at 13*. He explained his methodology as follows:

> First, we estimate the base value of Jack Palmer's salary to be $136,113, a two (2) year average of 2010 and 2011. The base value of Jack Palmer's salary is grown in 2012, 2013, 2014, and 2015 by actual wage growth data from the Bureau of Labor Statistics (BLS) to derive the projected salary in the aforesaid years. [SOURCE: U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics (OES), Median Hourly Earnings, All Occupations, http:www.bls.gov/oes.]
>
> *Id.*

Mr. Young thus took a two-year average of Mr. Palmer's salary and applied annual increases for each year after that in accordance with a Department of Labor chart showing income trends across all occupations. The result was the following salary projections:

| Year | Salary |
|------|--------|
| 2012 | $137,610 |
| 2013 | $140,087 |
| 2014 | $142,468 |

23

| 2015 | $144,748 |
| Total: | $564,913 |

*Id.* *(Table 5)*.

Mr. Young then took the difference between the total of the above projections ($564,913) and the total actual salary that JDC paid Mr. Palmer during the same time period ($304,500) to arrive at a total lost salary estimate of $260,412. *Id.* *at 14 (Table 6)*.

## B.    Legal Argument

The opinion as to lost salary of Mr. Palmer should be excluded because it is not relevant. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (internal quotation omitted). Further, it is axiomatic that to recover damages in a legal action, the individual or entity seeking the damages must bring claims upon which the court may grant such relief. See Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994) ("Federal courts may only resolve actual 'cases' and 'controversies.'") (citing U.S. Const. art. III, § 2). Indeed, the existence of a case and controversy brought before the court through valid legal claims is a prerequisite to relief in all federal actions. Florio, 40 F.3d at 1462. See also Fed. R. Civ. P. 54(c) ("final judgment should grant the relief to which each party is entitled") (emphasis added).

Here, the opinion testimony proffered to make Mr. Palmer whole is not relevant because Mr. Palmer is not a party to this action and does not have standing to recover damages. From JDC's perspective, and as explicitly acknowledged even under Mr. Young's framework, Mr. Palmer's salary was a cost. JDC therefore cannot somehow include within its alleged damages additional salary it would have paid its employee but for the alleged unlawful conduct. See Pleasant Valley Promenade v. Lechmere, Inc., 464 S.E.2d 47, 59 (N.C. Ct. App. 1995) (measure of damages in contract actions is compensatory and consequential losses incurred, less costs avoided); accord RSB Lab. Servs., Inc. v. BSI, Corp., 847 A.2d 599, 608 (N.J. App. Div. 1004) (same). Thus, the proffered testimony is not relevant or helpful to the trier of fact and should be excluded.

## V.     The Opinion Regarding Future Losses to JDC and Mr. Palmer

### A.     Mr. Young's Methodology

After calculating the foregoing past losses to JDC and Mr. Palmer, Mr. Young next attempted to calculate "future" losses from January 1, 2016 onward. See Young Report, 14-15. Although Mr. Young stated that his intent was to project these losses through December of 2019, see id. at 14 ("Essentially we are providing JDC 3.95 years [to December 2019] of additional profits from the SunGard relationship"), that is not what he did. Mr. Young combined the lost salary to Mr. Palmer and lost profits to JDC into one sum, then projected it into

perpetuity and reduced to present value by applying a capitalization-of-earnings method:

> Next we calculate the lost Profits and salary of Jack Palmer into the future. To perform this analysis, we use a methodology commonly referred to as the Capitalization of Earnings method. The Capitalization of Earnings method provides the perpetual value of the Profits and salary of Jack Palmer into the future, starting January 1, 2016. In order to perform this calculation we take the projected Profits of JDC and protected salary of Jack Palmer on December 31, 2015 (together $330,968) and multiply it by one plus 4.0% (1+4.0%) (Estimated long term growth rate of the industry) then divide it by the difference of the Capitalization Rate of 25.3%.

> *Id.* at 14 (emphasis added).

Thus, while JDC continues to operate as a going concern, and while Mr. Palmer is a mortal human being, Mr. Young calculated $330,000+ in combined annual losses into perpetuity, without considering Mr. Palmer's expected retirement or life span, or offsetting anticipated earnings from SunGard and other customers. Mr. Young concluded that the present-day value of this combined corporate and personal earnings stream is $1,360,499. *Id.*

**B.    Legal Argument**

Mr. Young's methodology for projecting future losses to JDC and Mr. Palmer does not meet the admissibility threshold. At this step of the analysis, as at all prior steps, the relevant Daubert factors compel exclusion. Mr. Young did not have a proper factual foundation. He inexplicably deviated from a well-established

methodology (discounting) to one that is totally inapposite here (capitalization). He did not analyze key variables. He reached conclusions that are not remotely connected to the record and, in some respects, physically impossible. These issues are discussed below.

First, the projection of future losses rests upon an unsteady factual and analytical foundation. The starting point for this projection was the annual-profit figure Mr. Young derived for 2015 by applying the fabricated 26% revenue-growth rate and 8.7% "adjusted" profit-margin growth rate to the Shapiro data. Because these projections as to past losses served as the jump-off point for this future projection, it suffers from all of the same reliability defects discussed under Sections I and II above.

Second, even putting aside these foundational deficiencies, the method Mr. Young applied to project future damages through December of 2019 was incorrect. While Mr. Young attempted to estimate an additional 3.95 years of lost profits beyond January 1, 2016, he used the wrong technique for doing so. There is a difference between discounting lost profits over a finite time period and capitalizing a revenue stream into perpetuity:

> When one forecasts specific future monetary amounts, such as cash flows, and then uses a discount rate to convert each of these amounts to present value terms, it is known as *discounting*. The rate used to convert the future amounts to present value terms is the discount rate. Continuous monetary streams that are growing at a

> certain positive rate or not growing at all are called *perpetuities*. Computing the present value of such a stream is called *capitalization*. The interest rate used for this present value conversion of a perpetuity is called a *capitalization rate*.
>
> <u>Patrick A. Gaughan</u>, Measuring Business Interruption Losses and Other Commercial Damages (2nd Ed.), p. 277.[5]

Because Mr. Young applied the capitalization methodology, he calculated purported losses into perpetuity, rather than for a finite period ending in December of 2019 as he apparently intended.

Third, even assuming Mr. Young meant to extend the alleged damages in this matter through the end of time, he provided no valid justification for doing so. He provided no analysis of SunGard's demand from 2016 onward. He provided no analysis of JDC's operating costs during that time period. He provided no offset for anticipated actual profits, including profits that could or should be earned through mitigation efforts (*e.g.*, profits from other or new customers). And once again he offered nothing to connect the gap between Walker's limited direct sales

---

[5] <u>See</u> <u>also</u> <u>Robert J. Cimasi</u>, Valuation Approaches, Methods, and Techniques, § 32.04 (capitalization method "presumes the continuation of benefit derived from the practice to be *in perpetuity*") (emphasis in original); <u>Shannon Pratt</u>, The Lawyer's Business Valuation Handbook: Understanding Financial Statements, Appraisal Reports, and Expert Testimony, p. 109 (implicit assumption in capitalization method is that income stream will continue into perpetuity); <u>PNC Bancorp, Inc. v. C.I.R.</u>, 212 F.3d 822, 829 (3d Cir. 2000) ("an important determination is whether given expenditures [extend] into the indefinite future, indicating the need for capitalization.").

to SunGard in 2012 to 2014 and the conclusion that, had it not made those sales, JDC would have earned profits at or greater than the projected 2015 levels into perpetuity.

Fourth, and finally, insofar as Mr. Young jumbled future salary losses to Mr. Palmer into this projection method, his method is not relevant or reliable. It is not relevant because, as discussed, Mr. Palmer is not a party. It is not reliable because it is logically impossible; Mr. Palmer cannot earn a salary forever, even if Mr. Young could otherwise offer some legitimate explanation for how SunGard's revenues would pour in indefinitely at the astonishing rates he projected—which, for all of the reasons discussed above, he cannot.

## CONCLUSION

Rule 702 proscribes the admission of junk science through the testimony of ostensibly credentialed individuals. That is what JDC attempts here. For all of the foregoing reasons, Walker respectfully submits this testimony should be excluded in its entirety.

**BROWN & CONNERY, LLP**
Attorneys for Defendant

Dated: May 6, 2016          By:    *s/ Eric D. Milavsky*
William M. Tambussi
Eric D. Milavsky

**WALL BABCOCK, LLP**
J. Dennis Bailey, Esquire
(*admitted pro hac vice*)

29